This is an action under the Federal employers' liability act to recover damages for the alleged negligent killing of Kemp Saunders, who was struck by a southbound freight train on the yards at Thomasville, while crossing the southbound main line returning to the camp train, to the crew of which he belonged.
Saunders was employed by the defendants as a member of a crew engaged in erecting an electric block signal system for the defendant from Salisbury, N.C. to Denim, N.C. in place of another system (377) then in use. The work this crew was doing was planting poles near the track and stringing wires thereon. At the time in *Page 423 
question the work had progressed as far as Thomasville, at which point, in the outskirts of the town, the train on which the crew slept and ate camped. On the morning of 17 August, 1912, between 6:30 and 7 o'clock a. m., the work train left the camp, moving on the northbound main line to a point just south of the passenger station, from which point it was to proceed in a short while to the place where they were working, at or about the northern outskirts of the town of Thomasville. At the point where the work train stopped there are four tracks, viz., the northbound main line, on which the camp train stood, the southbound main line, a side-track, and another track called the delivery track, next to the freight depot. When the camp train stopped near the passenger station, Saunders, together with a fellow-workman, Thornbro, and, according to some of the witnesses, with another fellow-workman whose name was not recalled, left the camp train, passed over the railroad main line and the two side-tracks and went between some box cars standing next to the freight depot. While returning from the point to get abroad his own train, which began moving out just as or shortly after he had left the box cars, and while in the act of crossing the southbound main line, he was struck and killed by a southbound freight train.
G. D. Gloer, a witness for plaintiff, testified as follows: "I live at Statesville and work in furniture factory there. I was working for Southern Railway Company on the block signal line at Thomasville at the time of the death of Mr. Saunders. I had been working there about three weeks and had become acquainted with Saunders. He was there when I went there. This construction force was called the block signal gang. I do not know how long Saunders had been there when I went there. We spent the nights in a car of the Southern Railway Company. I saw Saunders on the morning he was killed; it was at breakfast, about 6:30. The cars were at the orphanage grounds at Thomasville. The cars were moved up to Thomasville over the northbound main line and stopped south of the station. I was sitting in the car door on the left-hand side. I saw Saunders after the car stopped; he had gotten off and gone across the southbound track and was coming back when I saw him. There are four tracks at this point. He was over about the box car, I think. I do not know what he was doing. He was coming back from the car when I saw him. I think he relieved his bladder. He was between two box cars; the box cars were standing on the side-track near the loading place near the depot and on the side-track across the main line. There were not toilet facilities provided on our train. Our train had not started in motion when I saw him coming back — it started just about the time he got near the southbound track; our train was going north, moving slowly, and Saunders was going in the direction of our (378) train. He was crossing the southbound track and had stepped *Page 424 
one foot over the last rail when the train hit him. It was a southbound freight train that hit him. I would judge it was running 20 or 25 miles an hour. I did not hear the freight train blow and whistle or ring any bell. I was on the side of the car next to the freight train. I do not know what part of Saunders' body the train struck. I did not see him after the train hit him. He kind of had his back to the train. He was something like 3 or 4 feet from our train when he was hit. Our train was on the northbound track going north, and the train that struck him was on the southbound track going south. I know where two street crossings are, and Saunders was something like 30 or 40 yards from the north street crossing when the train struck him. I was sitting in the third or fourth car of our train. Saunders was right across the railroad right opposite me when the train struck him. I do not know how many cars in our train or how many there were in the through freight that was passing. It looked like it was going at full speed through Thomasville. It is built on both sides of the track and near the hotel." There was other evidence to the same effect.
The rules of the defendant were introduced.
The jury returned the following verdict:
1. Was the plaintiff's intestate killed by the negligence of the Southern Railway Company, as alleged in the complaint? Answer: "Yes."
2. Did plaintiff's intestate, by his own negligence, contribute to his own death? Answer: "Yes."
3. What damages, if any, is plaintiff administrator entitled to recover of the defendant? Answer: "$3,500."
Judgment was rendered in favor of the plaintiff, and the defendant appealed.
Three questions are presented by the appeal:
1. Was the intestate of the plaintiff employed in interstate commerce at the time of his death?
He was an employee of the defendant engaged in installing a new and improved block system along the track of the defendant in place of another system already in use, and at the time of his death was returning to his work train, from which he had been absent for a necessary purpose only a few minutes, and it is admitted that the defendant was engaged in interstate commerce over said track.
Upon these facts two recent decisions of the Supreme Court of the United States (R. R. v. Zachary, 232 U.S. 248, and Pedersen v. *Page 425 R. R., 229 U.S. 146), which were approved in R. R. v. Behrens, (379)283 U.S. 473, compel us to answer the question in the affirmative.
In the Zachary case it was held that a fireman, who had prepared his engine for its run in interstate commerce, and was temporarily absent, going to his boarding-house, was "still on duty and employed in interstate commerce, notwithstanding his temporary absence from the locomotive," and, in the Pedersen case, that an employee was employed in interstate commerce who was carrying a sack of bolts or rivets to be used in repairing a bridge, which was regularly used in interstate and intrastate commerce.
In the last case the Court says: "That the defendant was engaged in interstate commerce is conceded, and so we are only concerned with the nature of the work in which the plaintiff was employed at the time of his injury. Among the questions which naturally arise in this connection are these: Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier? The answers are obvious. Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars, and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition, and efficiency of commerce depends in large measure upon this being done. Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct `any defect or insufficiency . . . in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment' used in interstate commerce. But independently of the statute, we are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it. The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements and the nature of each determined regardless of its relation to others or to the business as a whole. But this is an erroneous assumption. The true test always is, Is the work in question a part of the interstate commerce in which the carrier is engaged?"
In support of the ruling that the plaintiff there was engaged in interstate commerce, the Court cited, among others, the case of Zikos v. O.R. and N. Co. (C.C.A.) 179 Fed., 893, where it was held that a section hand, working on a track of a railroad over which both interstate *Page 426 
and intrastate traffic is moved, is employed in interstate commerce (380) within the meaning of the act; Central R. Co. of N.J. v. Colasurdo, 192 Fed., 901, 113 C.C.A., 379, where the same was held as to a railroad trackman injured while repairing a switch in a terminal yard; and Darr v. B. and O. R. Co., (C.C.A.) 197 Fed., 665, to the same effect, where the employee was injured while making repairs on a car used indiscriminately in both interstate and intrastate commerce.
The question was considered by the Supreme Court of Utah in an able and learned opinion upon facts substantially like those in the record before us (Grow v. Oregon R. R., 138 P. 398), and the same result reached. The reasoning of the Court covers so fully the contentions made here that we reproduce it at some length. The Court says: "We think the rule announced in the Pedersen case is decisive of the question here. If, as there announced, an employee engaged in repairing a car, engine, or track, or constructing or repairing a switch or bridge along a track used in interstate commerce, is, within the meaning of the act, employed in such commerce, then, do we think, was the deceased here also employed in such commerce. The defendant confessedly was engaged in interstate commerce. In carrying on such commerce it had been, and then was, using its track and line of railway for such purpose from Salt Lake to Huntington. For the better conduct of such commerce and the moving of such traffic, and to promote the safety of employees in operating interstate trains and of passengers transported from State to State, it was necessary, or at least desirable, to equip its line of railway with block signals. For that purpose were they installed. They are not separate and apart from the track — something operating independently of it, or independently of the interstate commerce in which the defendant was engaged — but are, in a sense, a part and parcel of the track itself, something attached to and operated in connection with it in carrying on such commerce. Now, should it be said that an employee in repairing a car which had been, and was intended to be, used in interstate commerce is employed in such commerce, but if he be engaged in attaching to such a car a new appliance, or equipment, something not theretofore used on such a car, he is not engaged in such commerce? Or, if the employee is engaged in repairing a bridge along a track used in interstate commerce he is engaged in such commerce, but if he, along such a track, is engaged in putting in a new bridge or conduit where theretofore there was none, he is not engaged in such commerce? Or, if one along such a track — one used in interstate commerce — is engaged in taking up an old or defective rail and inserting a new one, he is engaged in such commerce, but if he, for the better operation of trains along such track and to promote the safety of passengers carried on and employees operating interstate trains, *Page 427 
is engaged in attaching to such a track some new appliance or equipment, he is not engaged in such commerce? Suppose that in pursuance of its business of interstate commerce, and to better carry (381) it on, the defendant had been engaged in putting in a switch along its track used in such commerce, or in constructing a double track over a part or all of its way. Is there any good reason for holding that an employee, who is engaged in repairing the track, or switch theretofore constructed or used, is employed in such commerce, but that one engaged in putting in the new switch, or the additional track, is not employed in such commerce?
"We think it clear that one employed in installing and equipping the road with the block signals was engaged in doing something which was a part of the interstate commerce in which the defendant was engaged, to the same extent as one engaged in repairing a bridge or a track in such commerce."
2. If the intestate of the plaintiff was employed in interstate commerce, the employers' liability act is applicable, and the finding upon the second issue does not bar a recovery, but it is necessary to examine the instructions upon the first issue.
The defendant contends, if the case is to be tried under the Federal statute, that the common law of the Federal courts must be administered, and that under the decisions of those courts it was error to charge the jury that if the defendant failed to give notice of the approach of its train by signal, and this failure was the cause of death, they should answer the first issue "Yes," as the deceased was not killed at a crossing.
Speaking accurately, there is no common law of negligence of the Federal courts as distinguished from the common law of negligence of the State courts.
The law of negligence is the same in both, and apparent differences of opinion arise because of the application of the law to different combinations of facts, and frequently on account of confusing negligence which may or may not be the cause of an injury and actionable negligence which unites cause and effect.
In Western Union Tel. Co. v. Pub. Co., 181 U.S. 101, the Court quotes with approval from Smith v. Alabama, 124 U.S. 465, that: "There is no common law of the United States in the sense of a National customary law distinct from the common law of England as adopted by the several States, each for itself, applied as its local law, and subject to such alteration as may be provided by its own statutes. Wheaton v. Peters, 8 Pet., 591. A determination in a given case of what that law is may be different in a court of the United States from that which prevails in the judicial tribunals of a particular State. This arises from the circumstance that courts of the United States, in cases within their *Page 428 
jurisdiction where they are called upon to administer the law of the State in which they sit, or by which the transaction is governed, (382) exercise an independent, though concurrent, jurisdiction, and are required to ascertain and declare the law according to their own judgment. This is illustrated by the case of R. R. v. Lockwood, 17 Wall., 357, where the common law prevailing in the State of New York in reference to the liability of common carriers for negligence received a different interpretation from that placed upon it by the judicial tribunals of the State; but the law as applied is none the less the law of that State."
The Federal courts and the courts of this State concur in holding that a failure to exercise the diligence and care of a person of ordinary prudence, or a failure to perform a duty due from one to another is negligence, and that if this breach of duty is the proximate cause of an injury, it is actionable.
"Both parties are charged with the mutual duty of keeping a careful lookout for danger, and a degree of diligence to be exercised on either side is such that a prudent man would exercise under the circumstances of the case in endeavoring fairly to perform his duty." Improvement Co. v.Stead, 95 U.S. 161. They also agree that the care required is dependent on the circumstances then existent.
Let us, then, see the conditions surrounding the deceased and the engineer of the defendant, and whether the defendant owed the deceased any duty which it failed to perform.
The deceased was killed in the populous and busy town of Thomasville, near the depot of the defendant and between two public crossings. The defendant operated four tracks at this place, two of them main-line tracks and two sidings. On one of the side-tracks there were box cars and on another track the work train of the defendant. The train which killed the deceased was an extra, and was running upon another track at a speed of from 20 to 30 miles an hour. This train was rounding a curve and was about 200 yards from the deceased when the engineer could first see him.
The rules of the defendant then in force required the alarm whistle to be sounded and the brakes applied when any person, animal, or other obstruction appeared on the track or so close thereto to be in danger, and to give reasonable warning when persons or cattle were on the track, and to ring the bell on approaching every crossing, and to sound the whistle at all whistling posts, and, when running extra trains, to sound the whistle on approaching curves where the view of the track was obstructed.
These rules were promulgated by the defendant for the protection of its employees as well as for the protection of the general public, and they *Page 429 
were presumably known by the engineer on the track and by the deceased, and both had a right to assume that they would be observed. If so, the defendant owed the duty to the deceased of giving notice of the approach of the train by signal, and the jury has found that it (383) has failed to perform its duty and that this failure was the cause of the death of the intestate.
The instructions given to the jury which are the subject of criticism by the defendant imposed no higher duty than the defendant had undertaken to perform, and it is not certain that they did not require the plaintiff to prove more than the law demanded of him, as in each of them the burden is cast upon the plaintiff not only to prove that no signal was given for the benefit of the plaintiff, who was on or near the track of the defendant, as required by its rules, but, in addition, that no signal was given at the crossings.
This case is distinguishable, in our opinion, from those relied on by the defendant, holding that the duty imposed upon a railroad company to sound its whistle when approaching a crossing is not due to one injured between the crossings, in that the deceased was killed near the depot of the defendant in a town where people use the streets between the crossings, and in the further fact that the location of the cars and tracks made the conditions dangerous and that the rules of the defendant required it to give notice to the deceased of the approach of its train.
3. Was the plaintiff entitled to recover more than nominal damages?
The evidence tends to prove that the relations between the deceased and his father were affectionate, and that the deceased had contributed to the support of his father, from which the jury had the right to infer that he would continue to do so.
We have recently considered the question in Dooley v. R. R.,163 N.C. 454, and in Irwin v. R. R., 164 N.C. 5, and are content to abide by the conclusion we then reached.
Upon a consideration of the whole case we are of opinion that there is no reversible error.
No error.
Cited: Gaddy v. R. R., 175 N.C. 517 (1c); Lancaster v. Coach Line,198 N.C. 109 (3p); Griggs v. Sears, Roebuck Co., 218 N.C. 168 (3p). *Page 430