JOSEPH GADDY v. THE NORTH CAROLINA RAILROAD COMPANY.

(Filed 8 May, 1918.)

1. **Commerce—Railroads—Statutes—Federal Decisions.**

   Where it appears from plaintiff's evidence, in his action to recover damages from a railroad company for a wrongful injury, that he was engaged in interstate commerce at the time, the Federal statute excludes and supersedes the State law in regard to the doctrine of assumption of risks, and the decisions of the Supreme Court of the United States will control.

2. **Same—Master and Servant—Assumption of Risks—Employer and Employee.**

   While under the decisions of the Federal court the doctrine is recognized that the master should furnish the servant reasonably safe tools and appliances and place to work, and to keep and maintain them in such condition, they also enforce the doctrine of assumption of ordinary risks by the employee incident to his employment, including his continuing to work without objection when he has knowledge of a defect and an apprehension of the danger which it entails.

3. **Same—Evidence—Nonsuit—Trials.**

   Where an experienced switchman of an railroad company is injured while acting for the company in the course of his employment, in interstate commerce, and it appears from his own evidence that he was at the time engaged with a crew in switching cars upon several diverging tracks, with full knowledge of the conditions; that after leaving a car that had been "kicked" upon one of the tracks he, with knowledge of the approach of other cars "kicked" upon another track, was injured by his foot catching between the guard and stock rails and run over by the cars moving towards him, and to which he was walking to continue his duties as brake-

man ; that at the time he saw that the cars had no brakeman on them to stop them, and had seen them "kicked" upon the track: *Held,* under the Federal decisions, the employee assumed the risks, and a motion to nonsuit thereunder should have been allowed in his action to recover damages against the railroad company.

4. **Commerce—Railroads—Through Trains—Master and Servant—Employer and Employee.**

A railroad switchman engaged in making up a through train passing into, through and beyond the State is engaged in interstate commerce.

CLARK, C. J., dissenting.

APPEAL by defendant from *Harding, J.,* at the July-August Term, 1917, of DAVIDSON.

This is an action to recover damages for personal injury.

The plaintiff, together with five others, composed a switching crew on the railroad yards of the defendant's lessee at Spencer, N. C., and on the first day of November, 1915, was switching cars and making up trains on the yard. About the hour of 12 :15 o'clock p. m., the crew was working in the north end of the yard shifting cars and making up trains. From the north end of the yard they backed in on the straight lead track, which leads entirely through the yard and extends from Spencer to Salisbury. They coupled up to seven cars on the said straight lead and pulled these cars north on the ladder lead, which connects all the switch tracks in the north end of the yard. There are sixteen switch tracks connected with the ladder lead. The cars are switched by being taken out on the ladder lead and the switches set for the tracks upon which the cars are to be placed, and the cars are kicked in on these tracks wherever they are desired to be placed for the purpose of making up trains.

After the crew had pulled the cut of seven cars out on the lead they kicked one car down on the double track, which car plaintiff rode about 100 yards down the track. The engine and balance of crew then went out onto the ladder lead with the other cars for the purpose of placing these cars on other tracks. It was their purpose to put three cars of the seven attached to the engine into an orange train, which was a through freight train from Spencer, N. C., to the Potomac Yards, Va.

When plaintiff had set the brakes on the car which he rode down the double track, he dismounted from the car and saw the balance of the crew were cutting off three cars on the ladder lead for track No. 2 or 3. He got off the car he had stopped and walked down the main line of the railroad and crossed over to the track where the three cars were to be placed. He was about 60 feet from the cars—saw them coming down toward him; he walked toward the cars about three feet and attempted to cross the track at the switch for the purpose of getting on the cars

on the other side. In attempting to cross the switch his foot was caught between the guard rail and the stock rail and fastened, and before he could get it out the front truck of the first cars passed over his foot, cutting off part of his foot. When plaintiff saw that he could not get his foot out he laid down between the rails and the front truck passed over his foot. He crawled from under the car between the front and rear trucks.

Plaintiff says that he saw the cars coming toward him—saw the cars as they were cut loose when he was on top the car on double track; that there were three cars in the cut, the first car being a gondola car loaded with scrap iron, destined for Richmond, Va.; that the said cars were rolled about 15 miles per hour; that he knew there was no one on the cars to stop them; that it was his duty to stop the cars, which was done by applying the brakes when they had rolled to the place where he wanted them to go.

Plaintiff was an experienced brakeman; had been engaged in this work at this place for eleven years; was thoroughly familiar with this kind of work; he belonged to the crew that was doing the switching and making up the trains, and he was what was called "field man"; that it was his duty to get on the cars and apply the brakes at the place he wanted to stop them; that he knew of the guard rail.

At the conclusion of the evidence the defendant moved for judgment of nonsuit, which was refused, and the defendant excepted.

The defendant also requested the court to instruct the jury to answer the issue as to assumption of risk in favor of the defendant if they believed the evidence, which was refused, and the defendant excepted.

The jury returned a verdict in favor of the plaintiff, and judgment was rendered thereon, from which the defendant appealed.

*John A. Barringer for plaintiff.*
*Linn & Linn for defendant.*

ALLEN, J. Accepting the plaintiff's evidence as true, he was employed in interstate commerce at the time of his injury (see note to *R. R. v. Behrens,* 233 U. S., 473, 33 Anno. Cases, 165; *Sanders v. R. R.,* 167 N. C., 379; *Rich v. R. R.,* 166 Mo. App., 379), and the action must therefore be disposed of under the Federal statute, which is exclusive and supersedes the right of action under the State law, and which, unlike the statute in this State, recognizes the assumption of risk as a defense. *Renn v. R. R.,* 170 N. C., 128, affirmed 241 U. S., 290.

The doctrine of assumption of risk, first recognized in the courts about 1837, when *Priestly v. Fowler,* 3 M. & W., 1, was decided in England, and *Murray v. R. R.,* 1 McMullan (S. C.), 385, and *Farwell v. R. R.,*

4 Met. (Mass.), 49, in this country, is upon the idea that the employee knows and appreciates the dangers of his employment and assumes the risk of these dangers as a part of the contract of service, being paid for his risk in the increased wage, and also upon the ground of public policy, it being assumed that the employee will be more careful if he knows that he will not receive compensation for injuries received in the course of his employment.

Many of the courts, regarding the reasons upon which the doctrine is based as a fiction adopted to throw upon the employee all the hazards of the employment, have been reluctant to give it effect and have frequently taken hold upon seemingly immaterial matters to avoid its results. Consequently there is great diversity and conflict in judicial opinion as to the correct application of the doctrine, which we will not attempt to examine, as this action must be tried under the Federal law, and we are only concerned with what we conceive to be the doctrine of the Federal courts as announced by the Supreme Court of the United States. That Court enforces the rule that it is the duty of the employer to provide reasonably safe and adequate machinery and appliances for the use of the employee and to keep and maintain them in such condition, and that a failure to perform this duty is negligence. *Gardner v. R. R.,* 150 U. S., 349. It also holds that the employee assumes the ordinary risks incident to his employment, and that if he continues to work without objection, having knowledge of a defect and an apprehension of danger, and is injured, that this is one of the ordinary risks of his employment. *R. R. v. McDade,* 135 U. S., 570.

In *Butler v. Frazee,* 211 U. S., 459, it is held that "One understanding the condition of machinery and dangers arising therefrom, or who is capable of doing so, and voluntarily, in the course of employment, exposes himself thereto assumed the risk thereof, and if injury results cannot recover against the employer."

In *R. R. v. Shalstrom,* 195 Fed., 729, it is said: "Although the risk of the master's negligence and of its effect unknown to the servant is not one of the ordinary risks of the employment which he assumes, yet if the negligence of the master or its effect is known and appreciated by the servant, or is obvious, or 'so patent as to be readily observed by him by the reasonable use of his senses, having in view his age, intelligence, and experience,' and he enters and continues in the employment without objection, he elects to assume the risk of it, and he cannot recover for the damages it causes."

In *R. R. v. Archbald,* 170 U. S., 671, *White, C. J.,* says: "The elementary rule is that it is the duty of the employer to furnish appliances free from defects discoverable by the exercise of ordinary care, and that the employee has a right to rely upon this duty being performed; and

GADDY. v. R. R.

that while in entering the employment he assumes the ordinary risks incident to the business, he does not assume the risk arising from the neglect of the employer to perform the positive duty owing to the employee with respect to appliances furnished. An exception to this general rule is well established, which holds that where an employee receives for use a defective appliance and with knowledge of the defect continues to use it without notice to the employer, he cannot recover for an injury resulting from the defective appliance thus voluntarily and negligently used."

Running through the cases is the principle that if the employee has knowledge of the conditions and the dangers, or if these are obvious, and he continues in the employment without objection, he is held to have assumed the risk, although he may be injured by reason of some neglect of the employer, and in its application it was held in *Seley v. R. R.*, 152 U. S., 145, that a brakeman, familiar with a certain freight yard, whose foot was caught in an unblocked frog while making a coupling assumed the risk.

The Court, after referring to several decided cases, says: "The evidence showed that Seley had been in the employ of the defendant for several years as brakeman and as conductor of freight trains; that his duty brought him frequently into the yard in question to make up his trains; that he necessarily knew of the form of the frog there in use; and it is not shown that he ever complained to his employers of the character of frogs used by them. He must, therefore, be assumed to have entered and continued in the employ of the defendant with full knowledge of the dangers asserted to arise out of the use of unblocked frogs.

"*Appel v. R. R.*, 111 N. Y., 550, 19 M. E., 93, was a case where the plaintiff's intestate was a brakeman employed in coupling cars in the yards of the defendant at Buffalo, N. Y., and while so engaged his foot was caught in an unblocked frog, and he was run over and killed; and the Court of Appeals held that 'in accepting and continuing in the employment, the deceased assumed the hazard of all known and obvious dangers, and that he was chargeable with notice of the difficulty in removing the foot when caught in the frog and of the danger to be apprehended therefrom, and therefore that a cause of action was not made out, and a refusal to nonsuit was error.' "

The facts in the case from New York and in the *Seley case* are more favorable to the employee than are the facts in the case before us, as in those cases there was evidence of a defect in the frog in which the foot of the employee was caught, while here there is neither allegation nor evidence that the guard rail which caught the foot of the plaintiff was defective.

The plaintiff is a man of eleven years experience; he was familiar with the yards where he was working; he knew of the existence and location of the guard rail; that the cars had been kicked towards him; that they were coming at the rate of 15 miles an hour, and every condition which had any bearing upon his injury was obvious and known to him, and under the authorities cited we must hold that he assumed the risk of his injury.

The *Seley case,* with its approval of the case from New York, is also authority for the position that it is proper to enter a judgment of nonsuit when the evidence for the plaintiff makes out clearly the defense of assumption of risk.

His Honor was in error in refusing to enter the judgment of nonsuit upon the defendant's motion, and our decision upon this question makes it unnecessary to consider the other exceptions. ·

In *Ware v. R. R.,* at this term, the plaintiff was not employed in interstate commerce, and the action was tried under the State statute, which does not recognize assumption of risk as a defense.

Reversed.

CLARK, C. J., dissenting: As stated in the opinion of the Court, "Many of the courts deem the doctrine of assumption of risk a fiction adopted to throw upon the employee all the hazards of employment," and such it undoubtedly and clearly is; but even that doctrine goes no further than to hold that the employee assumes "the ordinary risks incident to his employment properly operated." When there is negligence on the part of the employer, either in the manner of operation or in the nature of the appliances furnished, whether defective or not of the best kind in general use, or there is failure to furnish a reasonably safe place to work, and in similar instances, the employee does not assume the risk of such negligence on the part of the employer. To do so would be to exempt the employer from liability for negligence. There is one exception, and that is where the implement furnished is defective but the employer is ignorant of the defect and the employee, with knowledge thereof, fails to inform the employer. The rule as to what is "assumption of risk" is the same in the Federal as in the State courts.

In this case the defendant was "kicking" the cars back without any man on the rear car to give notice of their approach, or to stop them. This has always been held negligence on the part of the employer. *Bradley v. R. R.,* 126 N. C., 735; *Peoples v. R. R.,* 137 N. C., 98. This was held irrebuttable negligence, as to those not employees, in *Purnell v. R. R.,* 122 N. C., 832, where the car was running backward at 4 miles an hour, this Court saying that when the train is rolling backwards (even though it is not "kicked") there "must be both a man and a light

at night and a man and a flag by day" on the rear car which is thus rolling backward. That case has been cited numerous times, as will be seen in the Anno. Ed., the most recent cases being *LeGwin v. R. R.* (*Hoke, J.*), 170 N. C., 361; *Mumpower v. R. R.*, 174 N. C., 742.

As to an employee, we have cases exactly "on all-fours" with the present case. In *Lassiter v. R. R.*, 133 N. C., 244, the conductor in charge of the freight train was killed in a railroad yard by a shifting engine moving backwards at 4 miles an hour. The Court held that this was negligence on the part of the company, and that whether the conductor was guilty of contributory negligence was a defense to be submitted to the jury. There was no intimation that the conductor assumed the risk of the company's negligence in running the car backward at 4 miles an hour without giving notice.

In *Peoples v. R. R.*, 137 N. C., 97, it is said: "There was evidence that at the time the intestate was killed he was in the discharge of his duties as an employee of the defendant, with his mind absorbed in the attempt to mount the shifting engine coming towards him, with his back to the approaching box cars, which were giving him no warning of their approach, and which were not properly manned with a lookout upon the leading car," and it was held that the refusal to nonsuit was proper, citing *Lassiter v. R. R.*, 133 N. C., 247; *Smith v. R. R.*, 132 N. C., 824.

In the present case the defendant was guilty of negligence in "kicking" back the car, also in not having a lookout on the rear end of the car and, further, in rolling back the car at 15 miles per hour. All these were acts of negligence, the risk of which, therefore, was not assumed by the plaintiff.

Furthermore, there was evidence, from the foot of the plaintiff being caught between the guard rail and the stock rail, that it was not properly constructed, *res ipsa loquitur,* and this was further evidence of negligence. *Raper v. R. R.*, 126 N. C., 563. If the jury should have so found, then the defendant had not furnished the plaintiff a safe place to work. This also was a risk which the plaintiff did not assume. The fact that he might or might not have known that the switch was defective did not place upon him the risk, for it does not appear that, knowing the defect, he had failed to furnish the information to the defendant, who, moreover, was not shown to have been ignorant of it.

Furthermore, while it is true the plaintiff had been working in the yard for eleven years, he did not thereby assume the risks of the negligent operation of the defendant. *Lloyd v. Haynes*, 126 N. C., 359, which, quoting the English authorities as well as our own, pointed out the wide distinction between the "knowledge of the danger" and "voluntary assumption of risk," saying that "assumption of risk is a matter of defense, analogous to contributory negligence, to be passed upon by the

jury, who are to say whether the employee voluntarily assumed the risk; it is not enough to show merely that he worked on, knowing the danger." That case has been cited numerous times since (see Anno. Ed.) and has always been regarded as settled law.

Assumption of risk being a defense, the burden was on the defendant to prove it, and, therefore, also the motion to nonsuit should not have been allowed.

It may well be doubted if in all the cases that have come to this Court a more pathetic instance of mental anguish can be shown than in this case. The plaintiff was required to dismount from the car in motion which he had ridden down, and then to cross over the track where these other cars were coming and to get upon them while in motion. He had to cross the track in order to get on the car, which was coming down at about 15 miles per hour. His testimony is that "in attempting to cross the switch his foot was caught between the guard rail and the stock rail and fastened, and before he could get it out the front truck of the first cars passed over his foot, cutting off part of it. When plaintiff saw that he could not get his foot out he laid down between the rails and the front truck passed over his foot." He further says that "he saw the cars coming towards him—saw the cars as they were cut loose when he was on top of the car on double track; that there were three cars in the cut, the first car being a gondola car loaded with scrap iron, destined for Richmond, Va.; that the said cars were rolled about 15 miles per hour; that he knew there was no one on the car to stop them; that it was his duty to stop the cars, which was done by applying the brake when they had rolled to the place where he wanted them to go; . . . that it was his duty to get on the cars and to apply the brakes at the place he wanted to stop them."

It would require the vivid mental vigor of Victor Hugo to depict the mental sufferings of the plaintiff with his foot caught in the defective track between the guard rail and the stock rail and fastened. Seeing the leading car heavily loaded with iron coming on and his helplessness, he laid down on the track, allowing the car to pass over him, cutting off his foot. For this excruciating suffering and the terrifying mental anguish attendant, the plaintiff was entitled to compensation. "Mental suffering accompanying physical injury has always been held a proper element of damages to be considered by the jury." *Britt v. R. R.,* 148 N. C., 39, citing *Watkins v. Mfg. Co.,* 131 N. C., 536.

The court below properly denied the motion to nonsuit the plaintiff:

1. Assumption of risk is a defense and therefore is not ground for a nonsuit.

2. In *Kenney v. R. R.,* 165 N. C., 103, *Allen, J.,* said, "The word 'kicking' seems to be used in railroad parlance as synonymous with mak-

ing a flying switch," and cites from 3 Elliott on Railroads (2 Ed.), sec. 1265g, that "The practice of making running or flying switches is inherently dangerous, and is so considered by the courts in numerous decisions. The courts have not hesitated to hold railroad companies liable for injuries to trespassers on the track, thus inflicted, on the ground of negligence," and held that where an employee was thus killed it was sufficient in an action for negligence to submit the case to the jury. It was negligence to "kick" the cars back and especially at the rate of 15 miles per hour. It was negligence to require the defendant to mount such moving car and to send him across the track for that purpose in front of the car that he might get up on the other side.

3. It was evidence of negligence to go to the jury that in a crowded yard where men constantly had to cross the track in front of moving cars the space between the guard rail and the block rail was not filled up so as to avoid the plaintiff's foot being caught and cut off. *Raper v. R. R.,* 126 N. C., 563.

4. The defendant was not absolved from responsibility for its negligence in these several respects by the fact that employees oppressed by the strong necessity of earning a subsistence for themselves and families remain in the service of the corporation notwithstanding the knowledge that such negligence was daily used by the defendant. It is true that it was convenient to the company to save the expense of safer methods just as it would be economy not to use automatic car couplers or headlights or other necessary appliances—provided it was not required to pay for injuries and death occurring to the employees by such misconduct.

It is because corporations are intangible and therefore not liable to imprisonment or physical punishment that the courts resort to compensation to employees as a measure of justice to them and of punishment as well as to the corporations when injuries and death occur by such disregard of the safety of employees as was shown by the defendant in this case.

As the Court says in its opinion, "Assumption of risk is a fiction." It is created by the courts, and not by legislation, to throw upon the employee, as far as possible, liability for death or injuries sustained in the course of his employment. But such doctrine has never yet been extended to the point, in this State at least, that long continuance in such negligence and of so dangerous a nature should be deemed an exemption of the company from all liability. That would simply make continuance in wrongdoing a ground of exemption—the greater the wrong, the surer the safety from liability.

While "assumption of risk" is still held by the Federal courts to be a defense, which is not to be "apportioned" as in cases of contributory

negligence, it has not been extended by any case to require an employee to mount a car rolling 15 miles an hour, nor does it throw on him liability for a defective switch in the railroad yard.

Beyond controversy, the injury to the plaintiff was caused by the defendant not giving him time to go back and get upon the cars before they were shunted onto the sidetrack, or another member of the crew placed upon the rear end of the cars to stop them at any time, and in that the plaintiff was required to cross the track in front of cars rolling 15 miles an hour and mount the box car so that he might apply the brake to stop the cars on the switch track at a proper place. The defendant thus saved the expense of another necessary hand, but caused the loss of plaintiff's foot and might well have caused the loss of his life. The plaintiff was not injured in doing the act which caused his injury. He did not shunt the cars nor did he have anything whatever to do with kicking or shunting the cars and never had, according to the evidence. It is sardonic irony for the defendant to claim that the plaintiff was in any wise responsible for these matters over which he had no control.

There were decisions of the United States Supreme Court years ago which extended the doctrine of assumption of risk to cover some instances of pure negligence on the part of corporations. But the decisions of the courts grow wider and wider and more just with the passage of the years. In *Lochner v. New York,* 198 U. S., 45, that Court (reversing the Court of Appeals of that State) held invalid an act of the State of New York which prohibited the employment of bakers for more than ten hours in a temperature of 120 degrees. Last year it held valid the "Adamson Act," which prohibited the employment of railroad employees more than eight hours. Thus the thoughts of judges, as of other men, are "broadened with the process of the suns." A statute expresses the public will as it grows from time to time, and when the courts create law they must do the same.

By judicial decree it was long held that if one among many thousands of railroad employees was injured in its service he could not recover if the injury was caused in any degree by the negligence of a fellow servant—upon the "fiction" that he knew the character of his fellow servants and by remaining in service assumed the risk of any one of them being negligent or careless! That was changed by statute, and then for years the party injured could not recover if he himself, in any degree, was guilty of negligence contributory to the injury. Now, by both State and Federal statutes, contributory negligence does not defeat an action against a railroad corporation, but the damages must be apportioned.

The courts have also, without statutory authority, created the doctrine of assumed risk. This should not be stretched to supply the place

formerly occupied by the fellow servant doctrine or the doctrine of contributory negligence.

Till 1871 it was an indictable offense in England for two or more employees to ask for an increase of wages or to organize a laborers' union, and a strike was severely punishable. Today these unions everywhere are legal and the hours of labor are restricted by law, and in many States damages for injuries or death are awarded without the delay and cost of legal proceedings, while childhood is protected by an age limit.

We are moving out into more spacious times and into a larger field of vision. No court in the twentieth century should hold a railroad company free from liability when to reduce expenses for the increase of dividends to capital an employee is sent, as in this instance, on a dangerous errand across the track with a defective switch in which he is caught in front of cars rolling 15 miles an hour which he was ordered to mount and thus do the work of another man who should have been on the rear car already. The sense of justice of this age forbids such treatment. The lives and limbs of the employees who operate these great works of public necessity should not be exposed to such risks merely to increase dividends upon great aggregations of capital, nor should their wives and children be thus thrown upon the charities of the world because the necessities of the husband and father force him to accept employment. Justice to the laborer is to the interests of the employer and the public.

The British soldiers and sailors who fought at Blenheim, at Landen, at Talavera, at the storming of Badajos, at the Battle of the Nile, at Trafalgar, were rewarded with no pension (unless officers), but with a license to beg, and by a statute which made it a hanging offense for them to ask alms of a grateful country without such license. Today, not only in this country, but in England, disabled soldiers are pensioned. It is not just to apply to the soldiers of industry, upon whom the existence of civilization depends, and who are crippled in the discharge of their duty by unnecessary dangers imposed upon them, rules of law created by the courts, and not by any statute, at a time when labor had no rights which capital was bound to respect.

The judge below should be affirmed. A jury should find the facts.